**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| YVONNE JOHNSON, and<br>DEBRA KNUDSON,<br><br>     *Plaintiffs*,<br><br>v.<br><br>5 CHOICES, LLC; BUYPD, LLC;<br>BUYING SUMMIT, LLC; INCOME<br>PROPERTY USA, LLC; PROPERTY<br>DIRECT, LLC; INSIDER'S CASH, LLC;<br>SCOTT YANCEY; YANCEY, LLC;<br>SCOTT MCGILLIVRAY; PATHWAYS<br>EVENTS, LLC; FE EVTECH MEDIA,<br>LLC, d/b/a Abundance EDU; RESPONSE<br>NORTH, LLC, d/b/a Real Estate Education<br>Group; VEIL LEGAL, PLLC; VEIL<br>CORPORATE, LLC;  GUARDIAN LAW,<br>LLC; TOP PROPERTY MANAGEMENT,<br>LLC; BOB CANADAY; ROBINSON<br>REALTY, LLC; RASHAAD J.<br>ROBINSON; and FINANCIAL &<br>RETIREMENT RESOURCES, LLC, d/b/a<br>ACCUPLAN BENEFITS SERVICES and<br>ACCUPLAN,<br><br>     *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.<br><br>JURY TRIAL DEMANDED<br><br>Hon.<br>Assigned district Judge |

## COMPLAINT

COME NOW Plaintiffs, Yvonne Johnson and Debra Knudson, by and through undersigned counsel, and for their Complaint against Defendants, allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Yvonne Johnson ("Plaintiff Johnson") resides in California and purchased from Defendants, one residential property located within this judicial district which was conveyed to her Self-Directed IRA.

2.      Plaintiff Debra Knudson ("Plaintiff Knudson") resides in California and purchased from Defendants, one residential property located within this judicial district which was conveyed to her Self-Directed IRA.

3.      Defendant 5 Choices, LLC ("5 Choices") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. 5 Choices purchases and sells real property within this judicial jurisdiction and is an affiliate of the other Defendants in this cause of action.

4.      Defendant BuyPD, LLC ("BuyPD") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. BuyPD is an affiliate of other Defendants in this cause of action, namely Income Property USA, LLC, Buying Summit, LLC and FE EvTech Media, LLC. BuyPD markets real estate within this judicial district to potential purchasers and individuals who attend the "Buying Summit" seminars. It operates many of the other Defendants who conduct business within this judicial district.

5.      Defendant Buying Summit, LLC ("Buying Summit") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Plaintiffs purchased "training" and Buying Summit packages, paying substantial consideration to Buying Summit. Upon information and belief Buying Summit is an affiliate of BuyPD and Abundance.

6.      Defendant Income Property USA, LLC ("Income Property") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Purchasers of properties at the Buying Summit are provided documentation stating that they have purchased their properties from "Income Property." Income

2

Property maintains proprietary real estate listings and facilitates real estate transfers in conjunction with BuyPD. Upon information and belief, Income Property shares ownership with BuyPD and Abundance.

7.      Defendant Property Direct, LLC ("Property Direct") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah.

8.      Defendant Insider's Cash, LLC ("Insider's Cash") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Insider's Cash lends money to entities and individuals who purchase properties at the Buying Summit seminars as discussed in greater detail below.

9.      Defendant Scott Yancey ("Mr. Yancey") is an individual residing in Las Vegas, Nevada. Mr. Yancey stars in the A&E reality television show Flipping Vegas with his wife Aimee. Mr. Yancey regularly appears and endorses Defendants' seminars and has, upon information and belief, authored materials used by Defendants to encourage individuals like Plaintiffs to purchase real estate from Defendants.

10.     Defendant Yancey, LLC ("Yancey") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Plaintiffs purchased training and Buying Summit packages from Defendant Yancey.

11.     Defendant Scott McGillivray ("McGillivray") is an individual residing in Fort Myers, Florida. McGillivray stars in the HGTV television show Income Property. McGillivray regularly appears and endorses Defendants' seminars and has, upon information and belief, authored materials used by Defendants to encourage individuals like Plaintiffs to purchase real estate from Defendants.

12.     Defendant Pathways Events, LLC ("Pathways") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Pathways conducts real estate investment seminars throughout the United States, including the District.

13.     Defendant FE EvTech Media, LLC, d/b/a Abundance EDU ("Abundance") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Abundance conducts real estate investment seminars throughout the United States, including the District. Upon information and belief, Abundance shares common ownership with BuyPd and Income Property.

14.     Defendant Response North, LLC d/b/a Real Estate Education Group ("REEG") is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. REEG conducts real estate investment seminars and develops instructional materials in conjunction with Abundance and BuyPD.

15.     Defendant Veil Legal, PLLC ("Veil Legal") is a Utah Professional Limited Liability Company. Veil Legal prepares business formation, estate planning, and other legal documents for seminar attendees like Plaintiffs.

16.     Defendant Veil Corporate, LLC ("Veil Corporate"), is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Veil Corporate counsels and instructs seminar attendees on how to protect assets with complex estate planning and business entity creation.

17.     Defendant Guardian Law, LLC ("Guardian") is a Nevada Limited Liability Company. Guardian is a single law firm to which seminar attendees and potential real estate

purchasers were directed by BuyPD to handle the legal aspects of purchasing properties sold by BuyPD.

18.     Defendant Top Property Management, LLC ("Top Property") is a Missouri Limited Liability Company. Top Property was a property management company assigned by BuyPD to manage Plaintiff Johnson's property.

19.     Defendant Bob Canaday ("Canaday") is an individual residing in Missouri and is the designated broker and managing member of Top Property.

20.     Defendant Robinson Realty, LLC ("Robinson Realty") is an Illinois Limited Liability Company. Robinson Realty was a property management company assigned by BuyPD to manage Plaintiff Knudson's property.

21.     Defendant Rashaad J. Robinson ("Robinson") is an individual residing in Illinois and is the sole member and owner of Robinson Realty.

22.     Defendant Financial & Retirement Resources, LLC, d/b/a Accuplan Benefits Services and Accuplan ("Accuplan"), is a limited liability company organized and existing under the laws of the State of Utah, with its registered office located in the State of Utah. Accuplan counsels and instructs seminar attendees to create self-directed Individual Retirement Accounts to fund the purchase properties from BuyPD.

## JURISDICTION AND VENUE

23.     Pursuant to Fed. R. Civ. P. 20, these Plaintiffs may join in this one action because they assert a right to relief with respect to or arising out of the same series of transactions or occurrences and because questions of law or fact common to all Plaintiffs will arise in this action.

24.     Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 as one or more of the Defendants transact their affairs and conduct or have conducted their fraudulent scheme within this judicial district.

25.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the Defendants' violations of the United States Code, Including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, et. seq.

26.     This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative facts giving rise to the federal claims alleged herein.

27.     This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. §1367(a), (b) and (d) as each regularly transacts business in Missouri or has minimum contacts with Missouri, through their involvement with, management of, or receipt of funds from Plaintiffs, including the present ownership of real property within this judicial district, such that it is reasonable for this Court to exercise jurisdiction over all of them.

### INTRODUCTION

28.     Acting together, over at least the past four years and to the present day, the Defendants have perpetrated a fraudulent multi-state real estate investment scheme as a vehicle employed to defraud unsuspecting and naïve investors by inducing them to purchase real estate, sight unseen, in states where the victims do not live. The properties offered by were advertised as being offered at well below market prices.

29.     Initially, Defendants fraudulently induced Plaintiffs and others, to purchase real estate investment "training" programs and educational materials from and through associated entities entitled "Real Estate Group," "Abundance," and "Yancey, LLC" with the Plaintiffs paying anywhere from $1,998.00 to $29,997.00 for these programs.

30.     Defendants used the training programs as a platform to upsell the attendees to purchase access to "private pre-auction events" ("Events") which were held across the United States.

31.     At the Events, attendees were subjected to rounds of motivational speakers proclaiming the ease of attaining "financial security" and "financial freedom" by paying a large fee for investment "training" packages.

32.     Defendants' primary goal was to have attendees purchase access to attend a "Buying Summit," a large event generally put on by Defendants in Las Vegas, Nevada. At the Buying Summit, attendees were promised the opportunity to purchase residential rental properties offered by Defendants at deeply discounted prices.

33.     At the Events and Buying Summits, Plaintiffs and hundreds of other victims were continuously and fraudulently reassured by agents of Defendants that the properties offered for sale were offered at steep discounts and that the Defendants: a) had performed a full investigation into the condition of each property; b) had determined that the properties were in good condition so that that neither an inspection nor appraisal was necessary; c) had confirmed that properties were in good neighborhoods with good quality schools; and d) that each property had a vetted and paying tenant.

34.     In reality, the properties Defendants sold to Plaintiffs and other attendees at the Buying Summit were not tenanted, needed significant repairs to be "rent ready," were not

generating any rental income and the "deep discounted prices" were grossly misrepresented by Defendants.

35.     Based upon the Defendants' fraudulent misrepresentations in connection with Defendants' fraudulent schemes as further described herein, while operating in a number of states, including and especially within St. Louis County, Missouri, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et. seq., and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     Plaintiffs Attend The Free Seminar

36.     In October 2014, Plaintiff Johnson received a postcard inviting her and a friend to attend a free real estate seminar hosted by McGillivray, Abundance and Pathways Events at the Marriot Center in Woodland Hills, California.

37.     The postcard was a use of the mails by Defendants that was incident to an essential part of their scheme to defraud and was an incidence of wired fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C §1961(B) as it facilitated Defendants' fraudulent scheme.

38.     On November 9, 2014, Plaintiffs attended the seminar. During the seminar, Plaintiffs were told that with Abundance's help, they could purchase real estate at deeply discounted prices for investment purposes.

39.     Defendants had the attendees fill out a financial questionnaire which sought detailed information concerning the income, debt, credit card balances, 401k, and IRA Retirement account balances.

40.     At the seminar, Abundance representatives told numerous success stories about how other participants in its programs had become very wealthy by working with Abundance and its strategic partners, including BuyPD.

41.     Abundance representatives showed Plaintiffs and the other attendees "before and after" pictures of houses that BuyPD had acquired, rehabilitated, and resold for many times the purchase price.

42.     At the seminar, Abundance representatives told Plaintiffs and the other attendees that similar properties would be available to purchase from BuyPD at the "Buying Summit," a part of the "Diamond Tour Advanced Training" package offered by Abundance and its strategic partners, including BuyPD.

43.     In order to attend the Buying Summit, Plaintiffs would need to attend a three-day "Success in Real Estate" workshop for $1,998.00 and sign up for the "Diamond Tour Advanced Training," for $29,997.00.

44.     At the close of the seminar, Plaintiff Johnson purchased a three-day Abundance "Success in Real Estate Workshop" package for which she paid $1,998.00 by credit card.

## II.     *Plaintiffs Attend the Three-Day Workshop*

45.     On November 21, 2014, Plaintiffs attended the Abundance Three-Day Success in Real Estate Workshop ("Workshop") at the Marriot Center in Woodland Hills, California.

46.     Defendants gave Plaintiffs and attendees of the Workshop promotional materials from Abundance and REEG that promised to: "train you at our live, three-day real estate

workshop;" "provide on-going customer support for all your questions;" "show you how to complete your first (or next) deal;" "provide access to funding through our strategic partners;" "reimburse 100% of your tuition when you do a positive cash flow deal within 100 days;" and "provide our real estate guidebook with strategies for today's real estate market."

47.     Several different motivational speakers, including Yancey, presented information during the Workshop, urging the attendees that signing up for the various investment and training programs would be the gateway to financial independence.

48.     At the Workshop, the attendees, including Plaintiffs, were instructed by representatives of Defendants to call their credit card companies to inquire about raising their credit card limits so additional resources would be available to purchase additional real estate packages and seminars from Defendants.

49.     Abundance and its representatives heavily promoted the asset protection services available from Veil Corporate and Veil Legal at the Workshop.

50.     Abundance representatives told Plaintiffs to pay attention to Veil because Veil Corporate and Veil Legal would protect them from suit when they started making money as a real estate investor.

51.     On November 22, 2014, Plaintiff Knudson purchased from Defendants a Veil Corporate Legal Package for $595.00. The package included filing the necessary paperwork to create a single limited liability company. Plaintiff never used this service as she eventually conveyed the property she purchased from Defendants to a self-directed individual retirement account.

52.     On November 23, 2014, at the close of the Workshop, Abundance agents urged Plaintiffs and other attendees to sign up for the "Diamond Tour Advanced Training" package

("Diamond Package"), representing to them that it would Provide access to the Buying Summit where they would be able to purchase properties from BuyPD. Defendants also stated to Plaintiffs that the properties had already been vetted by BuyPD and were "rehabbed," income producing properties with long term tenants.

53.     Plaintiffs were told that they would also have access to additional services from Veil Corporate and Veil Legal who participated directly in the Buying Summit.

54.     Relying upon the representations and recommendations of Abundance and its agents, Plaintiffs signed up for the Diamond Package at a cost of $29,997.00, which Plaintiff Johnson paid with her credit card.

55.     The Diamond Package included "real estate investment training" plus airfare to and hotel accommodations in Las Vegas, Nevada. Plaintiffs were told that they could purchase deeply discounted properties at the Buying Summit which could not be obtained otherwise.

56.     In addition to the Las Vegas trip and participation in the Buying Summit, the Diamond Package also provided Plaintiffs access to a three-day, local training program called "Boots on the Ground."

57.     In sum, the Workshop was primarily a platform to advance Defendant's fraudulent scheme by encouraging Plaintiffs and the other attendees to continue to participate in Defendants' seminars and to ultimately purchase real estate from BuyPD at great cost to Plaintiffs and great benefit to Defendants.

### III.     The Las Vegas Diamond Tour and Buying Summit

58.     Plaintiffs attended the Buying Summit in Las Vegas, Nevada on December 11-14 2014, where attendees, including Plaintiffs, were expressly told that the houses offered for sale

by Defendants were already rehabbed, tenanted, under the care of a property management company and available at the Buying Summit for well below market value.

59.     Upon arriving at the Buying Summit, Plaintiffs were provided with a backpack which included numerous written materials including a Buying Summit Workbook.

60.     The written materials reinforced the fraudulent misrepresentations that Defendants made to Plaintiffs regarding the various properties that were for sale at the Buying Summit. Namely, that Defendants had performed rigorous due diligence with respect to every property that was offered for sale.

61.     Plaintiffs and other attendees were subjected to several rounds of motivational speakers who touted the deeply discounted properties for sale at the Buying Summit. Representatives of Defendants also urged Plaintiffs and other attendees to convert their 401k retirement plans to Self-Directed IRAs so they could have more purchasing power.

62.     At the express recommendations of Defendants, Plaintiffs established self-directed IRAs through Accuplan to purchase properties at the Buying Summit.

63.     The Self-Directed IRAs offered by Defendant Accuplan charge exorbitant fees, offer little benefit to the account holder and are an integral part of Defendants elaborate scheme to defraud potential investors.

64.     Defendant Accuplan also signed documents on behalf of Plaintiffs without their knowledge or consent.

65.     During the Buying Summit, BuyPD representatives made the following general representations about the rental properties it had for sale:

      A.     All properties for sale had been rehabbed and were rent ready;

      B.     BuyPD works with the best property management companies;

C.     BuyPD purchased properties at "wholesale" prices and sold them to buyers like Plaintiffs at "wholesale" prices without negotiating and without discounting;

D.     If Plaintiffs purchased a property from BuyPD, they could "sit back and watch the cash flow coming in;" and

E.     With respect to financing purchases from BuyPD, Insider's Cash had already "done the due diligence" and knew what the properties were worth, meaning that buyers would pay an appropriate, market rate for any properties purchased from BuyPD.

66.     Additionally, Defendants promoted a 24 month interest-only purchase-money loan at 12% interest from Defendant Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of Defendants' scheme to give the attendees a false impression that the homes they were purchasing were worth more than the loans.

67.     Plaintiffs relied to their detriment upon Defendants repeated material misrepresentations that Defendants had performed a rigorous due diligence on the properties and were offering them at "deeply discounted" prices.

68.     On or about December 12, 2014, representatives of BuyPD took Plaintiffs and the other attendees on a bus tour around Las Vegas, showing them houses that had purportedly been purchased, rehabilitated, and profitably rented by other participants in Abundance's training programs.

69.     While on the tour, an Abundance agent told Plaintiffs that they could purchase similar homes from BuyPD that were already rehabilitated and rented out to rent-paying tenants.

70.     As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, Plaintiff Johnson and Plaintiff Knudson were induced to attend a sales session and ultimately purchased two properties from Defendants.

### IV.     *Plaintiff Johnson and the Victory Property*

71.     At a sales session attended by Plaintiff Johnson on December 13, 2014, Ms. Johnson was encouraged to sit at a computer to view pictures of homes that BuyPD purportedly owned and was willing to sell.

72.     Plaintiff Johnson met with Jesse Harrison ("Harrison"), a BuyPD representative, and was shown pictures of what was purportedly 7407 Victory Court in St. Louis County, Missouri ("Victory Property"). The pictures portrayed a clean home in good condition. Plaintiff Johnson was encouraged to purchase the Victory Property as an investment property.

73.     Harrison made the following representations to Plaintiff Johnson concerning the Victory Property:

A.     That it was occupied by paying tenants who had a one-year lease at $700 per month;

B.     That it was in excellent condition;

C.     That Plaintiff Johnson could make a return on investment of 15%;

D.     That a structural inspection had recently been completed and revealed no issues whatsoever;

E.     That the property was worth at least $57,000.00; and

F.     That he was "shocked" that such a house was still available for purchase and that Plaintiff Johnson would miss out if she delayed.

14

74.     At the sales session, Harrison gave Plaintiff Johnson a "Property Analysis Report" with the logo of "Income Property USA" prominently displayed at the top. The first page of the report stated that it had been prepared by Harrison on December 13, 2014.

75.     Within the Property Analysis Report was a "Property Condition Report" for an inspection that allegedly took place on November 26, 2014 for the Victory Property.

76.     Each and every item listed on the Property Condition Report was described as "Inspected. Appears Good Or In Working Condition." The Property Condition Report noted no repair items whatsoever.

77.     Upon information and belief, the Property Condition Report presented by Harrison on behalf of Income Property and BuyPD contained little to no accurate information, was not premised upon an actual inspection of the Victory Property, and was prepared with the sole intent of deceiving Plaintiff Johnson into purchasing the Victory Property.

78.     The Property Analysis Report also included a Title Summary, prepared by Guardian Law, LLC. The Title Summary listed the title owner of the Victory Property as 5 Choices, LLC.

79.     Harrison represented to Plaintiff Johnson that no additional inspections of the Victory Property were necessary because the proposed lender, Insider's Cash, had already pre-approved a loan of up to 50% of the purchase price of the Victory Property.

80.     Relying upon Harrison's representations and the Property Condition Report Income Property had prepared on behalf of BuyPD, Plaintiff Johnson agreed to purchase the Victory Property for $44,950.00 from 5 Choices and made an earnest money payment of $8,302.00 to Income Property.

81.     On December 13, 2014, Plaintiff Johnson executed a sales contract for the Victory Property at the purchase price of $44,950.00. However, with various add-ons, including a $2,723.00 "loan origination fee" from Insider's Cash, "title charges" of $1,900.00 from Guardian Law, and other closing costs, the actual sales price was in excess of $50,000.00.

82.     Harrison indicated that Guardian Law would begin preparing documents for the closing on the Victory Property.

83.     On January 24, 2015, Plaintiff Johnson signed a Non-Recourse Commercial Loan agreement ("Loan Agreement") between Insider's Cash and the "American Estate and trust FBO Yvonne Johnson, IRA," Plaintiff Johnson's self-directed IRA.

84.     Pursuant to the terms of the Loan Agreement, Plaintiff Johnson would make interest only payments of $355.00 per month for 36 months and with the balance of the loan due in January 2018.

85.     On or about February 6, 2015, the Victory Property was conveyed by Warranty Deed from 5 Choices to American Estate and Trust FBO Yvonne Johnson, IRA.

86.     On February 24, 2015, Plaintiff Johnson received an email from Lyndsey Turner ("Turner") at Top Property Management advising Plaintiff Johnson that Top Property had been managing the Victory Property [on behalf of 5 Choices and BuyPD] and asked her to sign a copy of Top Property's management agreement ("Property Management Agreement") attached to the email.

87.     On February 28, 2015, Plaintiff Johnson signed the Property Management Agreement and returned a scanned copy of it to Top Property.

88.     Material to Plaintiff Johnson's signing of the Property Management Agreement were, without limitation, the following:

    A.     BuyPD's representations that the Victory Property was tenanted and generating rental income;

    B.     BuyPD's representations that a reputable property management entity was already managing the affairs of the Victory Property; and

    C.     The express terms and conditions of the Property Management Agreement.

89.    In March 2015, Plaintiff Johnson received a check from Top Property purporting to be rent from the tenant. This was the only check Plaintiff ever received from Top Property as the Victory Property was not tenanted.

90.    Shortly thereafter, Plaintiff Johnson found out that the Victory Property was not tenanted, was in a dilapidated state, needed significant renovations, and was incapable of being rented.

91.    Upon information and belief, the Victory Property had been a "cook spot" for the manufacture and sale of methamphetamine.

92.    On or about April 6, 2015, the City of Country Club Hills placed a sign reading "Not Approved for Occupancy" on the front of the Victory Property.

93.    Beginning in April 2015, Plaintiff Johnson made several inquiries to Top Property regarding the condition of the Victory Property as the then current condition was contrary to everything BuyPD and Income Property had previously represented.

94.    In an email dated April 20, 2015, from Plaintiff Johnson to Turner and Canaday, Johnson stated: "I tried contacting you this morning. It appears that I am not receiving my rent

checks for my property located at 7404 Victory Court, St. Louis, MO. Please confirm receipt of my property agreement signed and dated 2-20-2015 and receipt of rent status."

95.    Plaintiff Johnson did not receive a response from Top Property or its representatives.

96.    On or about May 22, 2015, Top Property submitted an application for the inspection of the Victory Property and scheduled an inspection to take place on June 7, 2015.

97.    On or about June 7, 2015, an Inspector from the City of Country Club Hills attempted to inspect the Victory Property but was unable to do so because Top Property was a "no show." The inspector issued an inspection report indicating that the Victory Property failed the inspection.

98.    On June 6, 2015, Top Property sent Plaintiff Johnson a "first notice of lease expiration" relating to the Victory Property.

99.    In response, Plaintiff Johnson sent Turner an email dated June 6, 2015, seeking clarification of the monthly rental payments previously made by the tenant purportedly living at the property. Plaintiff Johnson was also confused by the notice of lease expiration as she had been told that the Victory Property had a two (2) years lease when she purchased the property.

100.    In an email dated June 6, 2015, from Turner to Johnson, Turner stated that:

"The new tenant was not a new leesee [sic], they were new to us as a new property coming over. The lease expires 7/31. At this time, aside from the $1,200 payment he has not sent in any other rent and I am thinking we should not be renewing with him. In the mean time you will need to consider putting him into eviction regardless in order to go after him for back rent owed… The cost for Attorney's fees is $366. Please let me know how you would like to proceed, and if you choose eviction, let me know when you can send the payment and we will forward to our attorney."

101.    Upset by this response, Plaintiff Johnson sent an email dated June 9, 2015, to Harrison at BuyPD and stated: "You told me that this newly purchased property was rented for 1

year. Now I find out that I have to pay for eviction costs? And the rent paid is only $600 vs $700. I based this purchase on a Cash On Cash Performa Analysis that you sold me based upon all these facts. I am extremely disappointed and I need you guys to step in as promised."

102.   On June 17, 2015, Dallin Clemens ("Clemens"), client services representative of BuyPD sent an email to Turner requesting a copy of the owner statements for the Victory Property.

103.   In a reply email dated June 23, 2015, from Turner to Clemens, Turner stated: "The only payment the tenant has sent in was in March for $1,200. We have received no other payments from this tenant and he is needing [sic] to be sent to eviction. His current balance is $2,435.00."

104.   In or around July 2015, Plaintiff Johnson came to St. Louis to see the Victory Property and confirmed that:

A.   The Victory Property was and had been vacant;

B.   The Victory Property was in an uninhabitable condition and could not be rented to tenants;

C.   The Victory Property needed a substantial amount of rehabilitation to pass inspection at a great cost to Plaintiff Johnson;

D.   Top Property was not managing the property or actively seeking a tenant; and

E.   Top Property was not acting in the best interests of Plaintiff Johnson.

105.   On August 31, 2015, Plaintiff Johnson sent an email to Harrison and Clemens of BuyPD and Turner of Top Property and stated: "Please explain these pictures and more taken of

my property on Victory today. Unsuitable for human occupancy since 4/15 - notice on the front

and back doors of the property. I was told that the tenant moved out and was rented and it rent

ready for a year. I will send more pictures in a follow up email."

106.   Beginning in October 2015, Plaintiff Johnson communicated with Bud Ludstrom

("Ludstrom") of Veil Corporate and Haley Jarvis ("Jarvis") at BuyPD and stated:

> "Please see attached marketing appraisal data on my home per your request for the
> time I purchased it and now.
>
> I also want to make you aware that when I purchased the home as you recall I was told
> that it was rented for 2 years and that the price included rehab costs and passed
> occupancy inspection.  If this were true I would have been a happy home owner and
> investor.
>
> The facts are that I have evidence that the house did not pass inspection and was
> housing an illegal resident that had been living at 7407 Victory Ct. St. Louis for a long
> time and that I purchased this property from a previous BuyPD owner.  I understand
> that she sold it because she couldn't evict and pass occupancy inspection in July of
> 2014 when she tried to rent it so BuyPD sold it to me in December 2014 (closed
> escrow in 3/15) and I inherited the problem and hence the sticker dated 4/2015 "not
> approved for human occupancy" was on my door.
>
> In addition BuyPD suggested a Property Management Company, Top Property
> Management LLC, owned by Bob Canaday in St. Louis and I recently found out that
> he is being investigated with homes in the same area by the FBI.  We as a consumer of
> your educational materials trust that you have vetted these companies and that they are
> reliable as we are trusting your company to teach the ropes in real estate investing.
>
> Meanwhile I am still trying to obtain COI on my property (10/2016), and my property
> at 7407 Victory St. Louis is still sitting vacant.  In addition, I am dealing with a Mayor
> of the Country Club Estates that won't pass occupancy until I fix things like a fence
> and paint the out-side of the home (things that you would call cosmetic) AND IF
> YOU NEED PROOF OF THIS I HAVE IT. I have spent 17K + on rehab costs and
> upkeep as it sits vacant.
>
> The irony is that I paid $30,000 to attend the BuyPD summitt [sic] to purchase a
> turnkey home from a reputable company who teaches other investors how to play it
> safe and get a COC return of at least 12% and now I am sitting at least -20% COC
> return and may lose my whole entire 401K Investment placed in Accuplan.  Please
> advise or I am going to have to take additional action."

107.    In a reply email dated October 6, 2015, from Jarvis to Plaintiff Johnson, Jarvis stated:

"I do understand that your experience has been difficult, and I wish that there was more that I could do.  Unfortunately, this is not the case.

As the sellers, we got an inspection on the property before we purchased, and at that time, any repairs that were necessary were completed. This was confirmed by a re-inspection.

As far as the certificate of occupancy goes, this is something that would have needed to be completed by the property manager. I understand that this was not done, and there was a lapse with that. We have approved to pay for repairs that would be pertinent to obtain the c of o.

Additionally, I do understand that you are unhappy with the services of your property manager. I am really, so sorry that they haven't lived up to your expectation. I wish that there was more that I could do in regards to that, but being that they are a completely separate company, we can't take responsibility for any short comings of the property manager.  When we referred them, we did have a good relationship with them, and felt that they would do a fine job managing your property.  I understand that this wasn't the case, so again, I am very sorry.

If you do want to send the information that shows the exterior needs to be painted, etc. Per the country club, I would be happy to look that over."

108.    Throughout November of 2015, Plaintiff Johnson exchanged numerous telephone calls and emails with representatives of BuyPD and Veil Corporate with respect to the conditions of the Victory Property.

109.    Despite Plaintiff Johnson's requests, Defendants did nothing to rectify Plaintiff Johnson's concerns.

110.    On or about December 4, 2015, Plaintiff Johnson terminated the Property Management Agreement with Top Property, effective January 21, 2016.

111.    On or about September 23, 2016, a City of Country Club Hills inspector visited the Victory Property and identified a litany of different items that needed to be abated before an occupancy permit would be granted. Among the items identified by the building inspector were:

A.      The driveway needed to be leveled out and all cracks filled in and resealed;

B.      The backyard fence needed to be replaced;

C.      The windows and doors had to be caulked and reglazed;

D.      Replacement of the broken windows at the back of the house;

E.      Replacement of the outside air conditioning unit;

F.      Paint the front fence;

G.      Repair broken bedroom window frames;

H.      Replace all damaged and missing screens;

I.      All entrance doorways must have storm doors with closures and handles with latches;

J.      Installation of electric ground wire and ground rod;

K.      Circuit breaker was missing and there were loose wires above the panel;

L.      Removal of all unusable outlets, lights, fixtures, wires, and switches;

M.      Removal of a loose paint in the basement with waterproof paint;

N.      Insulate and cover in side wall;

O.      Ground and secure all outlets;

P.      Caulk cracks in the retaining wall and repaint;

Q.      Repair kitchen tiles at countertop and caulk sink bowl and side at walls of countertop;

R.      Seal around all pipes at walls and floors;

S.      Add rails to basement stairs; and

T.      Install a water meter so water could be turned on.

112.    As a direct and proximate result of the conduct of Defendants, Plaintiff Johnson suffered the following damages:

A.      $1,998.00 paid to "Yancey, LLC;"

B.      $29,997.00 paid to "Abundance EDU;"

C.      $44,950.00 paid to BuyPD toward the purchase of the Victory Property;

D.      The incurring of a $35,500 interest only note at 12% interest owed to Insider's Cash, LLC toward the purchase of the Victory Property;

E.      Closing costs and fees associated with the purchase of the Victory Property;

F.      Monthly interest payments toward the 12% note;

G.      Premiums for hazard insurance on the Victory Property;

H.      Extra-contractual markups and charges assessed by Top Property; and

I.      Lost profits from alternative, legitimate investment opportunities.

### V.    *Plaintiff Knudson and the Tyndall Property*

113.    At a sales session attended by Plaintiff Knudson on December 13, 2014, Ms. Knudson was encouraged to sit at a computer to view pictures of homes that BuyPD purportedly owned and was willing to sell.

114.    Plaintiff Knudson met with Jesse Harrison ("Harrison"), a BuyPD representative, and was shown pictures of what was purportedly 6273 Tyndall Drive in St. Louis County, Missouri ("Tyndall Property"). The pictures portrayed a clean home in good condition. Plaintiff Knudson was encouraged to purchase the Tyndall Property as an investment property.

115.    Harrison made the following representations to Plaintiff Knudson concerning the Tyndall Property:

A.   That it was occupied by paying tenants who had a one-year lease at $775 per month;

B.   That it was in excellent condition;

C.   That Plaintiff Knudson could make a return on investment of 15%;

D.   That a structural inspection had recently been completed and revealed no issues whatsoever;

E.   That the property was worth at least $80,000.00; and

F.   That he was "shocked" that such a house was still available for purchase and that Plaintiff Knudson would miss out if she delayed.

116.   At the sales session, Harrison gave Plaintiff Knudson a "Property Analysis Report" with the logo of "Income Property USA" prominently displayed at the top. The first page of the report stated that it had been prepared by Harrison on December 13, 2014.

117.   Within the Property Analysis Report was a "Property Condition Report" for an inspection that allegedly took for the Tyndall Property.

118.   Each and every item listed on the Property Condition Report was described as "Inspected. Appears Good Or In Working Condition." The Property Condition Report noted no repair items whatsoever.

119.   Upon information and belief, the Property Condition Report presented by Harrison on behalf of Income Property and BuyPD contained little to no accurate information, was not premised upon an actual inspection of the Tyndall Property, and was prepared with the sole intent of deceiving Plaintiff Knudson into purchasing the Tyndall Property.

120.    The Property Analysis Report also included a Title Summary, prepared by Guardian Law, LLC. The Title Summary listed the title owner of the Tyndall Property as 5 Choices, LLC.

121.    Harrison represented to Plaintiff Knudson that no additional inspections of the Tyndall Property were necessary because the proposed lender, Insider's Cash, had already pre-approved a loan of up to 50% of the purchase price of the Tyndall Property.

122.    Unbeknownst to Plaintiff Knudson but known to Defendants at the time of the purchase, the Tyndall Property had been available for sale at the distressed price of $20,000 on December 21, 2012.

123.    Thereafter, in a series of step transactions, Impressario, LLC ("Impressario") purchased the Victory Property on December 9, 2014 for $50,000.00. Impressario is a Missouri limited liability company with Defendant Robinson as its sole member.

124.    Impressario later sold the Tyndall Property to 5 Choices for $40,750.00 on January 9, 2015.

125.    Relying upon Harrison's representations and the Property Condition Report Income Property had prepared on behalf of BuyPD, Plaintiff Knudson agreed to purchase the Tyndall Property for $57,000.00 from 5 Choices and made an earnest money payment of $10,317.00 to Income Property.

126.    On December 13, 2014, Plaintiff Knudson executed a sales contract for the Tyndall Property at the purchase price of $57,000.00. However, with various add-ons, including a $3,005.50 "loan origination fee" from Insider's Cash, "title charges" of $2,050.00 from Guardian Law, and other closing costs, the actual sales price was in excess of $64,000.00.

127.    Harrison indicated that Guardian Law would begin preparing documents for the closing on the Tyndall Property.

128.    Plaintiff Knudson also paid Bud Ludstrom at Veil Legal, $4,000.00 for a "lifetime of LLC fillings" which plan had no value as the Tyndall Property was transferred to Ms. Knudson's self-directed IRA.

129.    On January 7, 2015, Plaintiff Knudson signed a Non-Recourse Commercial Loan agreement ("Loan Agreement") between Insider's Cash and the "American Estate and trust FBO Debra Knudson, IRA," Plaintiff Knudson's self-directed IRA.

130.    Pursuant to the terms of the Loan Agreement, Plaintiff Knudson would make interest only payments of $436.00 per month for 36 months and with the balance of the loan due in February 2018.

131.    On or about February 2, 2015, the Tyndall Property was conveyed by Warranty Deed from 5 Choices to American Estate and Trust FBO Debra Knudson, IRA.

132.    On or about March 4, 2915, Plaintiff Knudson received an email from Beth Blaylock ("Blaylock") at Robinson Realty welcoming her to the company.

133.    Blaylock asked her to sign a copy of the property management agreement which would retain and appoint Robinson Realty to manage the Tyndall Property ("Property Management Agreement").

134.    On March 17, 2015, Plaintiff Knudson signed the Property Management Agreement and returned a scanned copy to Robinson Realty.

135.    Material to Plaintiff Knudson's signing of the Property Management Agreement were, without limitation, the following:

A.   BuyPD's representations that the Tyndall Property was tenanted and generating rental income;

B.   BuyPD's representations that a reputable property management entity was already managing the affairs of the Tyndall Property; and

C.   The express terms and conditions of the Property Management Agreement.

136.   Shortly thereafter, Plaintiff Knudson found out that the Tyndall Property was not tenanted, was in a dilapidated state, needed significant renovations, and was incapable of being rented.

137.   Beginning in April 2015, Plaintiff Knudson made several inquiries to Robinson Realty regarding the condition of the Tyndall Property as the then current condition was contrary to everything BuyPD and Income Property had previously represented.

138.   In an email dated April 22, 2015, a representative of Robinson Realty admitted that the "property was currently vacant." Robinson Realty also advised Plaintiff Knudson that she is receiving a "rent guarantee" to compensate her for lost rent.

139.   On May 25, 2015, Plaintiff Knudson sent George Hartley ("Hartley"), owner relations representative of Robinson Realty, an email to inquire why the Tyndall Property still had not been rented.

140.   On May 26, 2015, Plaintiff Knudson sent an additional email to Hartley advising him that she had not received a check for May's rent as and for  the "rent guarantee."

141.    Hartley responded on May 26, 2015, advising Plaintiff Knudson that the "May owner statements have not went out yet." He did not address her question relating to the rental of the Tyndall Property.

142.    On May 31, 2015, Plaintiff Knudson sent Harrison of BuyPD, an email and stated that she was having issues with getting the house leased and believed it might have to do with Robinson Realty as the company had accounting issues, did not deposit her monthly "guaranteed rent" checks and failed to find a tenant for the property.

143.    In a follow up email dated June 7, 2015, from Plaintiff Knudson to Harrison, Knudson stated: "I want you to know that I will be giving Robinson Realty a 10 day demand letter. They have not paid rent since April 17th and that was for March. They owe April, May and June and when I call them they say its now accounting [sic] responsibility. I am regretting buying this property and wish I could sell it but am upside down. Isn't there anything you can do to help me or guide me, who should I talk to?"

144.    On June 7, 2015, Plaintiff Knudson sent an email to Hartley requesting an itemized income and expense statement from Robins Realty for the Tyndall Property. Plaintiff Knudson also advised him that she was a few months of rent payments and requested an audit to address her concerns.

145.    On June 10, 2015, Plaintiff Knudson sent Hartley another email regarding the Tyndall Property. In the email, Knudson expressed great concern as the Tyndall Property was vacant and boarded up. She stated that Robinson's failure to market and rent the property was causing her hardship. She also advised him that the Property was represented has having a lease at the time of her purchase.

146.    In an email dated June 10, 2015, from Hartley to Plaintiff Knudson, Hartley stated: "You should be under our 6 month rent guarantee which provides you rent although the house is not tenanted for six months. We do not manage the marketing on the house when it is sold to you. Whoever sold the property to you gave you false information about the property being tenanted, not Robinson Realty."

147.    Additionally, on June 10, 2015, Plaintiff contacted representatives of BuyPD via email and telephone calls relating to her concerns about the Tyndall Property.

148.    In response, Plaintiff Knudson received an email from Dallin Clemens ("Clemens") of BuyPD advising her that: "I got a reply from your property manager – George is the name of the guy that responded. He confirmed that the property in [sic] not currently tenanted, and that the property is currently being marketed. He also said that a few repairs are currently being done on the property will be completed within days. He doesn't feel like there will be any issues with getting the property tenanted. He also mentioned that you are under their 6 month rent guarantee. Again, when you get a chance just forward those owners statements to me."

149.    In an email dated June 11, 2015, from Plaintiff Knudson to Clemens, Knudson stated: "Thank you for speaking with me about my concerns today. Attached is a PDF copy of the supporting documents you requested and a copy on [sic] my Accuplan IRA showing I have not received any of the income we discussed. As I stated I was told at the time of purchasing this as an investment property that it has a new 2 year lease on if [sic] from 12/2014-12/2016. This house is boarded up and not being shown to prospective tenants….."

150.    On June 11, 2015, Plaintiff Knudson sent Hartley an email and stated: "As I before, I was told at the time of purchasing this as an investment property that it has a new 2 year

lease on it from 12/2014-12/2016. This house is boarded up and not easily accessible to prospective tenants. Also, I do not understand why I am receiving and being charged for bills that occurred prior to me legally owning the property.....”

151.    On June 12, 2015, Plaintiff received an email from Hartley advising her that the audit of her account revealed an accurate accounting of funds since Robinson Realty began managing the Tyndall Property. Attached to the email were copies of owner statements for the time period of the audit.

152.    In an email dated June 12, 2015, from Plaintiff Knudson to Hartley, Knudson voiced her concerns relating to the accuracy of the information contained in the owner statements and requested clarification as to certain charges and Robinson Realty's management of the Tyndall Property.

153.    Over the next few days, Plaintiff Knudson made several phone calls to representatives of Robinson Realty, namely Ashley Klenke (“Klenke”) and Hartley but never received a response.

154.    Around this same time, Plaintiff Knudson learned that Robinson Realty was not licensed with the Missouri Real Estate Commission to manage property in the state of Missouri.

155.    On June 19, 2015, Plaintiff Knudson sent an email to Klenke and stated: “I left you a voicemail earlier and would like to discuss cancelling and getting a refund for the property management agreement I signed with you months ago. I have had several communications with Beth and now George and nothing has been resolved. The billing errors, rent deposits and poor marketing of my home is extremely disappointing and I do not trust going forward that Robinson is a good fit for managing my properties.”

156.    In response, Klenke sent Plaintiff Knudson an email dated June 22, 2015 and

stated:

> "I wanted to email you, regarding your property, prior to calling. First, I want you
> to know that we have been marketing your property for rent. We have a software
> program that markets to several rental websites. We have several prospects, and
> we have been conducting showings on the house.
>
> I am not sure what you were told when you purchased the property, but we have
> finished the renovations, the property is going through the inspection process, and
> the property will be tenanted shortly after all inspections are passed. You have
> been receiving rent concessions on the property to make up for any rents you
> should be receiving. There are no rent deposits on the property at this time, as
> there is not a tenant in the property. When we do place a tenant in the property,
> we will escrow the deposit until the tenant moves out.
>
> I know that you had also expressed concern with Robinson Realty not being a
> licensed Real Estate agency. Our Property Management Agreement and Power of
> Attorney (for the property), that you signed, allows us to act as your property
> manager and act on your behalf regarding anything that may come up with the
> City, code, etc.
>
> From speaking with George, I understand that you are wanting [sic] to terminate
> your Property Management Agreement with Robinson Realty. While it is
> unfortunate to see you go, we will try to make this as smooth a transition as
> possible…."

157.    Shortly thereafter, Plaintiff Knudson terminated her agreement with Robinson

Realty and hired Eaton Properties, Inc. to manage the Tyndall Property. She also continued to

contact BuyPD regarding the condition of the property.

158.    In an email dated June 25, 2015, from Plaintiff Knudson to Harrison and Clemens

of BuyPD, Knudson stated: "Attached are pictures of the Tyndall Property. My new property

manager will be getting the bids needed to fix the house and make it rent ready. As of today

Robinson Realty has not paid me the rent due even though their statements say they have. I put

through my request to nullify my contract with then and return the money they took for

managing the property they did not manage."

159.    Despite Plaintiff Knudson's requests, Defendants did nothing to rectify her concerns.

160.    In or around July 2015, Plaintiff Knudson came to St. Louis to see the Tyndall Property and confirmed that:

      a.    The Tyndall Property was and had been vacant;

      b.    The Tyndall Property was in an uninhabitable condition and could not be rented to tenants;

      c.    The Tyndall Property needed a substantial amount of rehabilitation to pass inspection at a great cost to Plaintiff Knudson;

      d.    Robinson Realty was not managing the property or actively seeking a tenant; and

      e.    Robinson Realty was not acting in the best interests of Plaintiff Knudson.

161.    To date, the Tyndall Property remains in an uninhabitable state, with no tenant or possibility of being approved for an occupancy permit.

162.    As a direct and proximate result of the conduct of Defendants, Plaintiff Knudson suffered the following damages:

      A.    $57,000 paid to BuyPD toward the purchase of the Tyndall Property;

      B.    The incurring of a $35,500 interest only note at 12% interest owed to Insider's Cash, LLC toward the purchase of the Tyndall Property;

      C.    Closing costs and fees associated with the purchase of the Tyndall Property;

      D.    Monthly interest payments toward the 12% note;

    E.      Premiums for hazard insurance on the Tyndall Property;

    F.      Extra-contractual markups and charges assessed by Robinson Realty; and

    G.      Lost profits from alternative, legitimate investment opportunities.

## COUNT I
**(Racketeering Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962
Against All Defendants)**

163.    Plaintiffs incorporate herein by reference each and every prior allegation as though fully restated and alleged.

164.    RICO imposes civil liability on those who violate the provisions of 18 U.S.C.§ 1962.

165.    Each Defendant is a "person" as defined by 18 U.S.C. § 1961(3).

166.    The collaboration of Defendants is an "enterprise" as defined by 18 U.S.C. § 1961(4). As alleged above, the enterprise is engaged in and affects interstate commerce.

167.    As alleged above, the enterprise engaged in racketeering activity by committing multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1961(1).

168.    The conduct of the enterprise through a pattern of racketeering activity violated 18 U.S.C. § 1962(c).

169.    As a direct and proximate result of Defendants' enterprise, Plaintiffs suffered the damages alleged above.

WHEREFORE, Plaintiffs Yvonne Johnson and Debra Knudson respectfully request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.  Awarding Plaintiffs treble their actual damages in an amount to be determined at trial;

B.  Awarding Plaintiffs their reasonable attorneys' fees and costs as provided by statute; and

C.  Awarding Plaintiffs such further and additional relief and equity and justice shall require.

## COUNT II
### (Violations of the Missouri Merchandising Practices Act)

170.  Plaintiffs incorporate herein by reference each and every prior allegation as though fully restated and alleged.

171.  The actions and omissions of Defendants as alleged herein constituted violations of the Missouri Merchandising Practices Act, § 407.020 RSMo ("the Act").

172.  The Act provides in pertinent part that:

> *"(t)he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice." §407. 020 RSMo. (2000).*

173.  Under the Act, the term "merchandise" expressly includes sale and lease of real estate. §407.010 RSMo. (2000).

174.  The purpose of the Act is to preserve fundamental honesty, fair play, and right dealings in public transactions.

175.  Defendants engaged in methods, acts, uses and practices of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices, and the concealment, suppression and omission of material facts, all in violation of § 407.020, RSMo.

176.    Plaintiffs suffered damages proximately caused by the conduct of Defendants including, but not limited to, actual damages, attorney's fees, mental pain, anguish, emotional distress, embarrassment, humiliation, and inconvenience.

177.    The conduct of Defendants was willful, wanton, malicious, with intent to defraud, and was outrageous by reason of evil motive and/or conscious indifference to or reckless disregard for the rights of Plaintiffs, and without just cause or excuse, such that punitive damages should be assessed against Defendants to punish and deter them and others from like conduct.

178.    Pursuant to § 407.025 RSMo, Plaintiffs are entitled to recover their actual damages, attorney's fees, and punitive damages from Defendants.

WHEREFORE, Plaintiffs Yvonne Johnson and Debra Knudson respectfully request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.    Awarding Plaintiffs treble their actual damages in an amount to be determined at trial;

B.    Awarding Plaintiffs their reasonable attorneys' fees and costs as provided by statute; and

C.    Awarding Plaintiffs such further and additional relief and equity and justice shall require.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

**MIELCAREK LAW FIRM, LLC**

By:      */s/ Ryan C. Mielcarek*
          Ryan C. Mielcarek, #59354
          12816 Flushing Meadows Dr.
          Suite 150
          St. Louis, MO 63131
          Phone: (314) 910-2928
          Fax: (314) 821-4907
          Email: Ryan@rcmlawfirm.com

          *Attorney for Plaintiffs*